**Darvin L. YATES, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 85-893.**

District of Columbia Court of Appeals.

Submitted May 14, 1986.

Decided Aug. 6, 1986.

Gregg Schaaf, Washington, D.C., appointed by the court, was on brief, for appellant.

Joseph E. diGenova, U.S. Atty., Michael W. Farrell, Thomas J. Tourish, Jr., R. Jeffrey Behm, and Daniel S. Friedman, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before FERREN, TERRY and STEADMAN, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant of unauthorized use of a motor vehicle, D.C.Code § 22–3815 (1986 Supp.).[1] He contends on appeal that the trial court violated his Sixth Amendment right to present witnesses. More specifically, he asserts that the court coerced his co-defendant into repudiating a written statement that tended to exculpate appellant, in favor of testifying for the government that appellant had known the car was stolen. Appellant also claims he did not receive effective assistance of counsel. We affirm.

I.

On November 8, 1984, at approximately 8:40 p.m., Metropolitan Police Officer Michael Smith observed a beige Mustang

---

1. The court sentenced appellant to prison for a term of twenty months to five years, suspended execution of the sentence, and placed him on probation for two years.

bearing a license plate which, according to his "10–10" sheet, belonged to a stolen rental car. After following the car for six blocks, he and other officers boxed it in near a stop sign and arrested both occupants: appellant, who had been driving, and Carlton Williams, who was seated in the front passenger seat.

At the Sixth District police station, appellant called his brother, a police officer. After speaking with him, appellant waived his *Miranda* rights in writing and made an oral statement.[2] According to Officer Smith's testimony at trial, appellant told him that a friend of Williams who had worked for National Rental Car had given Williams the car and that appellant knew the car was stolen.

Appellant testified, to the contrary, that he knew Williams did not own a car but that Williams had told him he had rented a car. Appellant said that he had called Williams on November 8 to ask if he still had the car. Williams had replied that he did but did not have his license. Appellant then walked over to Williams' house and drove the car, with Williams as a passenger, to appellant's girlfriend's house. Later, after they left and were on the way home, the police stopped them. Appellant testified that he had not made a statement to the police about the car.[3]

Consistent with Officer Smith's testimony—not with appellant's—Williams testified that appellant had driven the car twice before November 8 and that, approximately two to three weeks before their arrest, Williams had told appellant the car might be stolen. Williams admitted that several months before trial he had given appellant's counsel a written statement that, to his knowledge, appellant had not known the car was stolen. He also acknowledged that he had pleaded guilty a few days before trial and that he hoped to receive a

lighter sentence by testifying for the government.

## II.

The day before trial, appellant moved for severance of his and Williams' trials. The motion stated that appellant allegedly had given the police an inculpatory statement, which he "vigorously contests making," and that Williams had given appellant's trial counsel a written statement exculpating appellant. The motion stressed that Williams' statement would be unavailable to appellant in a joint trial because Williams had announced he would not testify. The judge recognized that under *Jackson v. United States*, 329 A.2d 782, 787–88 (D.C.1974), *cert. denied*, 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74 (1975), the proffered testimony of one co-defendant exculpating another co-defendant might be a ground for severance if that testimony would be unavailable at a joint trial.

In order to determine whether the testimony would be exculpatory, the judge inquired further. With Williams' permission, his attorney advised the court that Williams' written statement to appellant's counsel did not—and could not—wholly exculpate appellant because Williams could not completely vouch for what appellant did not know. Thus, Williams' written statement, according to counsel, merely said "that [Williams] never told Mr. Yates the car was stolen." The judge then examined Williams' written confession on the night of arrest. She noted that it "corroborated in toto the alleged confession from" appellant the same night that, among other things, appellant knew the car was stolen. Williams' counsel confirmed the court's observation at least to the extent that there were no inconsistencies between appellant's

---

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court denied appellant's motion to suppress.

**3.** On cross-examination, appellant admitted that his testimony was inconsistent in some respects

with his previous testimony at the motions hearing, but he insisted that his motions testimony was false, at least in those aspects inconsistent with his trial testimony.

and Williams' statements.[4] Next, the judge examined the written statement Williams had given to appellant's counsel, at the Lorton Reformatory, two months after Williams' arrest. In that statement, the words "Darvin [appellant] has absolutely no idea" had been scratched out on advice of Williams' counsel. The revised statement was: "Darvin never asked me about how I got the car. And to the best of my knowledge, Darvin had no idea the car was stolen." The judge noted that she viewed Williams' confession at the time of arrest and his later statement to appellant's counsel as "inconsistent statement[s] to a certain extent."

The judge then asked Williams whether he would be willing to testify at a severed trial of appellant, a relevant factor in a severance decision. *Jackson*, 329 A.2d at 788. Williams' counsel expressed his reluctance to put Williams on the stand. Apparently as a way of resolving how many statements would be in evidence, the judge elected at this point to hear testimony on appellant's motion to suppress his oral statement to the police. She denied the motion. *Supra* note 2. The testimony revealed, however, that Williams and appellant had conferred with each other at the time of their confessions.

Returning to the severance issue, the judge noted again that Williams' confession and Officer Smith's report of appellant's confession were "completely consistent," and that Williams' later written statement to appellant's counsel contained a scratched out sentence and a much more "equivocal" sentence in its place. After stating in open court that she wanted Williams and his attorney to confer, the judge explained at some length what she wanted and why.

She noted that Williams' statement to appellant's counsel was not totally exculpatory because so much had been left out. She explained that Williams would be subpoenaed and then asked specific questions on direct and cross-examination to supplement the incomplete information in his written statement. Answering these questions under oath would be quite different from simply signing a witness statement, she said. She told Williams he must "keep in mind ... the possible penalty of perjury." The judge emphasized that she did not want to scare Williams; she just wanted him to tell the truth. "But it's not going to be the truth on a piece of paper where he can walk away." She also stressed that Williams should not "bail out a friend by lying." She then said that if Williams told the truth, she would accept that, "whatever it may be." She reiterated that, if Williams was telling the truth, she would sever the cases. "And it better be the truth," she implored. "That's all I'm saying because this Court will not tolerate perjury." She repeated several times that she wanted Williams to confer with his attorney.

When Williams and his attorney returned to the courtroom after their conference, counsel proffered that appellant had been in the car more than once before the date of arrest and that Williams "could not testify that Darvin Yates did not know the car was stolen."[5] Williams' attorney conceded that, if effectively cross-examined, Williams would probably make statements leading one reasonably to believe that appellant did know the car was stolen. The attorney also noted that both he and the court knew "exactly what's happening here," referring to the judge's earlier comments about lying for a friend. The judge then told Williams:

4. Williams' written confession is not in the record. From the court's and counsel's remarks, we cannot tell the extent to which Williams' confession confirmed appellant's oral statement that appellant knew the car was stolen.

5. This discussion with the court after Williams had conferred with his attorney took place without the presence of the prosecutor, appellant, and his attorney. The judge ordered the transcript of this colloquy sealed at the time, but it has since been unsealed and is part of the record on appeal.

I want you to be truthful. You cannot get—I mean, you've got this thing you've got to deal with. I mean, we all know that. And what I'm going to do as a result of it, I have no idea. Maybe you won't even get convicted. Who knows?

But as your attorney is saying it's not worth it to take a second [beef]. And, secondly, it's not worth it to deal with any Judge in this court, be it me or any other judge, *to lie and then have to face that judge for sentencing. I mean, you just don't do that.* [Emphasis added.]

Williams' counsel then stated:

I told him that as far as I was concerned, and there's no question in my mind that this Court feels that even a hint of perjury would go much worse against him than the crimes he's charged with. Which is precisely why I wouldn't call him as a witness if these cases are not severed, because I don't even want to give the Court the inkling that he's not being truthful.

The judge replied:

Let me also say, Mr. Williams, so he understands this, that I mean, I understand your feelings about wanting to help a friend and I respect that and I do understand that.

But right now, you have got to be absolutely truthful, because you're going to be under oath then, and I just wanted to make sure that if you went under oath, you could honestly and truthfully say—*having read the statements, I don't think he could say.* [Emphasis added.]

The next day, the judge advised the prosecutor and counsel for appellant that Williams' testimony would be unlikely to help appellant. Counsel for appellant asserted that the court's power over Williams' bond status, as well as her remarks of the previous day, had been coercive. The judge asked both Williams and his attorney whether either of them felt the court had put any pressure on Williams other than "to tell the truth." Each answered no, and Williams stated that he would "stick with"

his original story that appellant had known the car was stolen. The judge denied the severance motion.

Later that day, Williams pleaded guilty to unauthorized use of a motor vehicle and thus became available as a witness for the government at appellant's trial.

## III.

Appellant contends the trial judge coerced Williams into not testifying favorably for appellant. Williams was unfairly pressured, appellant claims, not only because the judge emphasized possible perjury but also because Williams feared the judge would sentence him harshly if his testimony did not conform to the judge's own "clearly stated notions of truth."

A defendant has a Sixth Amendment right to offer the testimony of witnesses and to compel their attendance at trial. *Washington v. Texas,* 388 U.S. 14, 17–19, 87 S.Ct. 1920, 1922–1923, 18 L.Ed.2d 1019 (1967). A trial judge violates this right if he or she makes unwarranted and excessively harsh remarks about perjury which have the effect of driving a defense witness from the stand. *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (per curiam) (trial judge on own initiative made "threatening remarks" to lone defense witness, a prisoner, about specific consequences that trial judge personally would ensure if witness took stand and lied).

Discussion of perjury with a potential defense witness, however, is not always improper, *Reese v. United States,* 467 A.2d 152, 158 (D.C.1983), particularly where there is an obvious, legitimate basis for the court's concern. In the present case appellant's severance motion, premised on the *Jackson* decision, focused the court's attention on the possibly exculpatory testimony of Williams, reflected in a written statement he had given appellant's attorney. The trial judge learned, however, not only that that statement was inconsistent with Williams' confession at the

time of his arrest but also that Williams had changed the wording of that statement, on advice of counsel, to make it less clearly exculpatory. She also knew that appellant and Williams had conferred with one another before they confessed to identical, inculpatory accounts of their actions. Finally, because Williams'· statement to appellant's attorney was guardedly exculpatory, the judge reasonably believed that more information would come out during cross-examination. The trial judge, therefore, had a legitimate basis for probing whether Williams would stand by his first (inculpatory) or second (exculpatory) statement; otherwise, she could not decide appellant's severance motion.

■ The government contends that the trial judge accordingly had leeway under *Reese* to address Williams as she did. In *Reese*, defense counsel told the court he planned to call as a witness Charles Miller, who would recant his grand jury testimony that the defendant had confessed to the crime. 467 A.2d at 158. The court summoned Miller's attorney to the courtroom and instructed him to consult with his client "before he exposed himself to prosecution for perjury by so testifying." *Id.* After consulting with Miller, the attorney informed the court that Miller still planned to testify. The court then advised Miller of his Fifth Amendment rights, of the potential use of his testimony against him, and of the penalty for perjury. *Id.* Several days later, Miller changed his mind and decided not to testify. *Id.* Because no one proffered evidence that Miller had cause to fear prosecution, the court held Miller in contempt for refusing to testify. *Id.* On appeal, rejecting appellant's claim that the trial court had improperly intimidated the witness into not testifying, we concluded that the court had "sought to insure that the witness was fully aware of his potential criminal liability," and that the court's

words were "pointedly informational," not coercive or threatening. *Id.*[6]

The trial judge's remarks in the present case were much more extensive than the judge's comments in *Reese*. However, their length as such does not determine the issue, since some of the remarks were entirely appropriate. For example, the judge properly pointed out that Williams would face detailed cross-examination under oath. Furthermore, the judge legitimately mentioned the danger of perjury "to insure that the witness was fully aware," *id.*, of the potential consequences of his testimony. Finally, the judge properly told Williams to consult with counsel before proffering what his testimony would be. *Id.*

If the judge's remarks had ended there, our task would be easy, for they would fall squarely within the "leeway" *Reese* allows. We are concerned, however, that the cumulative effect of the judge's comments may have created a real possibility that Williams changed his story in response to judicial coercion. Although the judge did mention several times that she would accept the truth—"that's fine," "whatever it may be"—she also urged Williams at least ten times to tell the truth, or not to lie, or to be honest. At least twice, moreover, she stressed that "it better be the truth" because "this Court will not tolerate perjury," and she expressly urged Williams not to "bail out a friend by lying." The judge also repeated several times that she wanted Williams to confer with his attorney. Finally, although the judge never said—before Williams conferred with counsel—that she did not believe Williams' second statement, her remarks, taken in their entirety, implied doubt about the version of the facts Williams provided appellant's attorney in that statement. *See Webb,* 409 U.S. at 97, 93 S.Ct. at 353 (court implied it expected witness to lie).

---

6. The present case is distinguishable in one respect from both *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (per curiam), and *Reese v. United States,* 467 A.2d 152, 158 (D.C.1983). In those cases, the issue was whether the judge's remarks drove the witness from the stand altogether. Here, the issue is whether the judge's remarks influenced the witness' testimony. Either consequence may deprive the defendant of a fair trial.

Significantly, however, the judge's most pointed remarks to Williams occurred after he and his counsel had returned to report that Williams would stick with his original story, not the version in the written statement. Only then did the court say "it's not worth it ... to lie and then have to face that judge for sentencing." *See Webb*, 409 U.S. at 96, 93 S.Ct. at 352 (if witness "lie[s] under oath," court "will personally see" that case goes to grand jury for perjury indictment and witness likely will be convicted). Only then, too, did the court expressly say "having read the statements, I don't think he could say [appellant did not know the car was stolen]."

In a close case, we conclude that the judge did not commit reversible error for four reasons. First, in ruling on the severance motion the judge had to deal with the *Jackson* exculpatory issue, complicated by Williams' conflicting statements; thus, her comments were not altogether gratuitous, as in *Webb*. The judge had a legitimate basis for determining what testimony Williams would give and, as in *Reese*, alerting Williams to the consequences of potential perjury.

Second, Williams' written statement, which had been revised with the help of counsel, was so guardedly exculpatory of appellant that the judge had a reasonable basis for wondering about its veracity; the judge, accordingly, cannot be faulted for stressing more vigorously than usual the importance of telling the truth.

Third, Williams' attorney shared responsibility with the judge for advising Williams. *See Reese*. His attorney knew the realities and already had counseled Williams about the dangers inherent in testifying. It is most unlikely, therefore, that counsel would have advised Williams any differently if the judge had been less repetitive and emphatic. In short, counsel shared responsibility with the court for advising Williams and thus influencing Williams' eventual decision.

Fourth, the judge's statement to Williams about the danger of lying before one's own sentencing judge, *see Webb*, 409 U.S. at 96, 93 S.Ct. at 352, as well as the judge's expressed belief that Williams' written statement was untrue, occurred after Williams' counsel had advised the court that Williams would stick with his original story. These comments, therefore, need not be considered, for nothing the judge said after counsel's announcement is relevant to the coercion issue.[7]

Given these circumstances, we cannot say that the trial judge's comments were so coercive that they deprived appellant of his Sixth Amendment right to present witnesses. We do agree, however, that these comments were unnecessarily repetitive and emphatic. The relevant points can be made clearly and succinctly, as in *Reese*, so that counsel can properly advise without risk that a witness will elect to testify in a particular way solely because he or she perceives the judge thinks it best.[8]

*Affirmed.*

7. Thus, the judge's colloquy with appellant's counsel the next day about whether Williams had been coerced, the judge's inquiry to Williams and his attorney about whether they had been coerced (and their answers that they had not), and the judge's comments to Williams when he pleaded guilty are after-the-fact pronouncements. Williams had already made the crucial change in his account of the facts.

8. Appellant also contends he was denied effective assistance of counsel because the judge so berated counsel that counsel lost her composure and, as a result, failed to obtain the admission of an essential exhibit into evidence. We find no merit to this contention because appellant suffered no prejudice from counsel's oversight. The content of the document (Williams' written statement to appellant's counsel explaining that appellant had not asked how Williams obtained the car, etc.) was placed before the jury. The prosecutor had elicited from Williams that he had made the previous statement, and defense counsel had explored the circumstances of the statement at length during cross-examination and argued the inconsistency during closing argument. Appellant has failed to demonstrate prejudice under *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).